UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

AL MAYA TRADING ESTABLISHMENT,

                                 Petitioner,

             -v-

GLOBAL EXPORT MARKETING CO., LTD,

                               Respondent.

------------------------------------------------------------------------X

14 Civ. 275 (PAE)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/15/2014

PAUL A. ENGELMAYER, District Judge:

      Petitioners here seek to compel arbitration, based on a 1999 written agreement with respondents that contains a binding arbitration clause. Trial is—and for some time, has been—scheduled to begin on September 2, 2014, limited to a single issue: whether, as respondent claims, the agreement is a forgery. *See* Dkt. 36 at 4. Respondent, however, has now come forward with an alternative argument: that, even if the contract at issue were authentic, it is governed by, and technically invalid under, the laws of the United Arab Emirates ("UAE").

      For the reasons that follow, the Court rejects that claim. The contract, the Court holds, is governed by New York law, and under that law, respondent has raised no claim of invalidity other than its alleged lack of authenticity. Trial will therefore proceed as scheduled, beginning September 2, 2014, on the single issue of whether the contract is a forgery.

**I.     Procedural Background**

      On January 14, 2014, Al Maya Trading Establishment ("Al Maya") petitioned this Court to compel arbitration with respondent Global Export Marketing Co., Ltd. ("Global"). Dkt. 1 ("Pet."). In its petition, Al Maya alleges that, on June 16, 1999, it entered into a written

agreement with Global, in which Global agreed that Al Maya would be its exclusive distributor in the UAE for Global's American Garden line of products.  Pet. ¶ 1; Dkt. 3 Ex. A (the "Agreement").  Al Maya alleges that Global has recently violated the Agreement by unilaterally terminating it.  Pet. ¶ 3.  Al Maya seeks an order, pursuant to the Agreement, compelling arbitration and appointing an arbitrator.  Pet. ¶¶ 4–5.

On February 26, 2014, Global moved to dismiss the petition, on the grounds that the Agreement is a forgery.  *See* Dkt. 12–24.  It contended that, although it has long had business dealings with Al Maya, those dealings were based not on a written agreement, but on a handshake agreement.  *See* Dkt. 24 ("Global MtD Br.") at 2.  Global submitted a number of sworn declarations in support of its claim of forgery.  Dkt. 20–23.  Global demanded a jury trial as to the authenticity of the Agreement, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4.  *See* Global MtD Br. 2–5.

On March 5, 2014, Al Maya filed an opposition to the motion to dismiss.  Dkt. 25 ("Al Maya MtD Br.").  Al Maya denied that Global had raised a genuine issue of disputed fact as to the authenticity of the Agreement.  However, it agreed with Global that, in the event the Court concluded that Global had raised a genuine issue of fact, an expedited trial was the proper means of determining whether the Agreement is authentic.  *Id.* at 1–8.

On March 12, 2014, Global replied.  Dkt. 31 ("Global MtD Reply Br.").  In its reply, Global raised a new argument: that Al Maya was not a "proper party in interest" because, it claimed, a different Al Maya corporate entity had been Global's distributor in the UAE since 2002.  *Id.* at 6.

On March 19, 2014, the Court ruled that the parties' dispute raised a genuine issue of material fact as to the authenticity of the Agreement—and therefore as to whether there was a

binding contractual duty to arbitrate the present dispute—which, pursuant to the FAA, was to be resolved at a jury trial.  Dkt. 36 at 2 (citing the FAA, 9 U.S.C. § 4 and *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 423 (S.D.N.Y. 2012)).  The Court ruled:

> This case will proceed towards the jury trial provided for by 9 U.S.C. § 4, with the sole issue to be decided being whether the Agreement was in fact signed by the parties, as Al Maya contends, or whether, as Global claims, it is a forgery.  The Court intends to move this case swiftly towards resolution:  The discrete factual issue presented appears likely limited in time, space, and relevant discovery materials.  And the FAA contemplates "efficient, streamlined procedures tailored to the type of dispute."

*Id.* at 4 (quoting *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1749 (2011)).  The Court directed the parties to meet and confer upon an expedited discovery schedule.  *Id.*

The Court also addressed Global's argument that a different Al Maya corporate entity had in fact functioned as Global's distributor.  It held that this argument is "a merits issue irrelevant to the instant motion to compel arbitration" and that "[a]ny claim along these lines is to be raised, if at all, before the eventual factfinder," *i.e.*, the arbitrator.  *Id.* at 4.  Thus, were the arbitration agreement held to be valid, any dispute as to whether Global was liable to the particular Al Maya entity with which it had contracted, and if so, whether it owed any damages for the alleged breach of contract, would be resolved by the arbitrator.  *See AT&T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649–50 (1986) ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. . . .  The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.") (citation omitted).

At a March 28, 2014 conference with the parties, the Court set this case down for trial beginning September 2, 2014.  Dkt. 37; *see also* Dkt. 44 ("IPTC Tr.") at 16.  The Court also approved the parties' case management plan and scheduling order, which stated: "Discovery will

be limited at this time to materials and matters relevant to the issue of whether the 1999 Agreement was in fact signed by the parties, as Al Maya contends, or whether, as Global claims, it is a forgery.  Following a trial on that issue, should the court proceed to the merits, the parties reserve the right to seek broader discovery."  Dkt. 38 at 3.

Fact discovery concluded on June 10, 2014.  *See* Dkt. 50.  Pursuant to the Court's ruling at the March 28, 2014 conference, any party that intended to move for summary judgment was to submit a letter, setting forth the basis for the anticipated motion, by June 19, 2014.  IPTC Tr. 17; *see also* Individual Rule 3.H.  Neither party filed such a letter.

On June 27, 2014, the Court held a pre-trial conference, at which it reviewed in detail the witnesses and evidence anticipated at trial.[1]  At that conference, Global made a new argument.  It asserted that if the Agreement were authentic, it is governed by UAE law, which imposes certain technical requirements that the Agreement does not meet.  Tr. 24–26.  Global sought to move for summary judgment on that issue.  Although expressing skepticism that respondents had properly preserved the issue, the Court, after an extended colloquy, directed briefing.[2]  Tr. 29–60.  On

---

[1] The Court cites the transcript of that conference, which has been made available to the Court but has not yet been docketed on ECF, as "Tr."

[2] At the conference, Global separately argued that the Agreement's arbitration clause is invalid because it does not specify the venue of the arbitration or identify the arbitral body.  Global claimed that these are essential terms that, as a matter of law, a Court may not supply.  Tr. 28. Global could not cite any law in support of that purported proposition of law.  Tr. 28–29.  And, as the Court and Al Maya both noted at the conference, that proposition is incorrect:  The FAA provides that, if an arbitration agreement does not provide "a method of naming or appointing an arbitrator or arbitrators," then "upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators . . . who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein."  9 U.S.C. § 5; *see* Tr. 28–29, 48–49.  The Court, however, gave Global the opportunity to submit case citations as to its legal theory.  *See* Tr. 48–49.  In its brief, Global did not cite any supporting case law, and has dropped this issue.

June 30, 2014, Global filed its memorandum of law on these points.  Dkt. 59 ("Global Br.").  On July 7, 2014, Al Maya filed its opposing memorandum of law.  Dkt. 60 ("Al Maya Br.").

On July 10, 2014, the Court issued an order giving the parties notice, for the purpose of pre-trial planning, that it had determined that the Agreement is governed by New York law, and that it would shortly issue an opinion—this opinion—setting forth its reasons for that ruling. Dkt. 63.

On July 11, 2014, Global moved for reconsideration of the Court's order of July 10, 2014, notwithstanding that the Court's opinion explaining the reasoning behind its order had yet to issue.  Dkt. 65 ("Global Reconsideration Br.").  As explained here, Global's brief in support of reconsideration abandoned some of its earlier arguments and sought to make new ones.

## II.     Discussion

Global argues that the contract is governed by, and invalid under, UAE law.  Al Maya makes three independent arguments in response: that (1) Global's request to apply foreign law is untimely under Federal Rule of Civil Procedure 44.1; (2) there is no conflict between UAE and New York law, because the Agreement is valid under both; and (3) if there is a conflict between UAE and New York law, this Court must apply New York law.  For the reasons that follow, each of Al Maya's arguments is meritorious.

### A.  Federal Rule of Civil Procedure 44.1

Federal Rule of Civil Procedure 44.1 requires that "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."  Fed. R. Civ. P. 44.1.  Congress passed Rule 44.1 in part "to avoid unfair surprise."  *Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 585 (2d Cir. 2005).  Notice

under Rule 44.1 must be reasonably timely.[3]  Al Maya argues that the Court should disregard Global's argument that the Agreement is invalid under UAE law because it was not reasonably timely.  Al Maya Br. 5–6.

"The District Court's determination regarding what constitutes 'reasonable . . . notice' under Rule 44.1 . . . falls within the discretionary powers of the District Court to supervise litigation."  *Rationis*, 426 F.3d at 585.

As to what constitutes reasonable timeliness, Rule 44.1 "does not attempt to set any definite limit on the party's time for giving the notice of an issue of foreign law; in some cases the issue may not become apparent until the trial and notice then given may still be reasonable."  Fed. R. Civ. P. 44.1 advisory committee's note.  Factors relevant to reasonableness include "[t]he stage which the case had reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue of foreign law sought to be raised."  *Id.*

In the Court's judgment, Global's announcement that it intended to raise the UAE law issue was not reasonably timely.  Global first disclosed this intention at the June 27, 2014 pretrial conference, over six months after Al Maya filed the petition and just over two months before trial was scheduled to commence.  The purpose of that conference was to review the witnesses

---

[3] Originally, Rule 44.1 required notice by "pleadings or other reasonable written notice."  Fed. R. Civ. P. 44.1 advisory committee's note, 39 F.R.D. 69, 117 (1966).  Consistent with the advisory committee's notes, courts interpreted "reasonable written notice" to include an element of timeliness.  *See, e.g.*, *Rationis*, 426 F.3d at 585; *Torah Soft Ltd. v. Drosnin*, 224 F. Supp. 2d 704, 718 (S.D.N.Y. 2002); *Nakano v. Jamie Sadock, Inc.*, No. 98 Civ. 0515, 2000 WL 680365, at *3–*4 (S.D.N.Y. May 25, 2000).  In 2007, Rule 44.1 was amended, and the phrase "or other reasonable written notice" was replaced with the phrase "or other writing."  *Compare Rationis*, 426 F.3d at 584 n.2 (quoting the version of Rule 44.1 current as of 2005) *with* Fed. R. Civ. P. 44.1.  Because the advisory committee made clear that "[t]hese changes are intended to be stylistic only," *see* Fed. R. Civ. P. 44.1 advisory committee's note, the Court determines that Rule 44.1 still includes a timeliness element, even though none is apparent from its face.

and evidence at the upcoming trial.  Prior to that point, the Court, and opposing counsel, understood this case to concern a single issue—whether the Agreement is a forgery—on which foreign law had no bearing.  That understanding was based on, *inter alia*, Global's brief in support of its motion to dismiss; the parties' case management plan; and the parties' conference with the Court on March 28, 2014—all of which focused on the forgery issue and none of which raised the UAE law issue.  *See* Global Mtd Br. 2 (listing the issues presented, and not including, or elsewhere mentioning, a UAE law issue); Dkt. 38 at 3 (case management plan, stating that "[d]iscovery will be limited at this time to materials and matters relevant to the issue of whether the 1999 Agreement was in fact signed by the parties, as Al Maya contends, or whether, as Global claims, it is a forgery"); IPTC Tr. 21 ("In any event, we are destined to have a trial here on the narrow issue of authenticity."); *see also* IPTC Tr. 6–7, 19.

Indeed, prior to the June 27, 2014 conference, the only time Global had made any reference to UAE law was in a single paragraph in one of its declarations in support of the motion to dismiss.  There, declarant Joseph K. Gheriafi cited some of the ostensible technical deficiencies that Global now raises, Dkt. 22 ¶ 5, apparently to make the point that these deficiencies were circumstantial evidence that the Agreement was a forgery, on the (dubious) theory that a signatory would not sign an agreement that contained technical deficiencies.  Global's brief in support of its motion to dismiss, however, did not so much as mention the technical problems that Gheriafi recited, let alone claim that these deficiencies made available to Global a second and independent defense, to wit, that the agreement, even if signed by the identified signatory, was a legal nullity under UAE law.  *See* Global MtD Br. 5.

Global's notice was unreasonable for a separate reason: Global did not even provide the Court and opposing counsel with Rule 44.1 notice before the conference.  *See* Fed. R. Civ. P.

44.1 (requiring notice by "a pleading or other writing"); *see also* IPTC Tr. 17 (directing that, if a party wished to move for summary judgment, it was to file a pre-motion letter by June 19, 2014); *see also* Individual Rule 3.H (pre-motion letters due 14 days after the close of fact discovery, *i.e.*, June 24, 2014).  Global thus created "unfair surprise" by springing a foreign law issue on the Court, and opposing counsel, at the June 27, 2014 conference without prior notice, written or otherwise.  Global's failure to raise the issue earlier deprived the Court, and opposing counsel, of the opportunity to explore and meaningfully comment on Global's notion that the agreement might be governed by, and void under, UAE law.

Further, when asked at the conference to explain its dilatory conduct, Global provided a wholly unsatisfactory explanation.  Global explained only that, until about a month prior to the conference, when it took the deposition of Al Maya's signatory to the contract, Devraj Kalwani, it "didn't have all of the facts," and that after that deposition, it obtained the opinion of an attorney in the UAE, which it received in "the past couple of weeks."  Tr. 42.  Global did not, however, explain concretely what facts adduced at that deposition alerted it that UAE law might be relevant.  On the contrary, that UAE law had the potential to be relevant has been obvious since the start of this litigation, insofar as the underlying dispute concerns the termination of Al Maya's distributorship in the UAE, the Agreement recites that Al Maya is based in the UAE, and the Agreement is stamped as having been signed by Al Maya in the UAE.

Simply put, it appears, from colloquy at the conference and the attendant circumstances, that Global, initially viewed its defense as solely its claim of forgery, and did not give serious thought to other potential defenses until much later.  In particular, it appears that Global began to contemplate other legal challenges to the Agreement after the discovery process led it to

conclude that it faced an uphill battle in establishing forgery at trial.[4]  *See* Tr. 30 ("THE COURT: For Heaven['s] sake, that [the absence of an identified arbitral body in the Agreement] was apparent on day one of this case.  Why is that being raised now?  MR. AAB:  Judge, we only considered whether there was a contract before.  I think that was really the issue.  Not whether, you know, the arbitration would be held.  We just thought if there is no valid contract, that the whole issue just evaporates.  But in looking at this, and thinking about what might be appropriate for summary judgment, it is another factor that we are looking at.  I wasn't really thinking about arbitration, because we had the underlying issue that if there is no contract, well, there is nothing to worry about.").  Even if Global truly had not considered other defenses before the conference, at most, that explanation would show that Global did not operate in bad faith, *i.e.*, that it did not willfully sandbag the Court and Al Maya.  But, under Rule 44.1, the standard is reasonableness, not bad faith.  Here, Global's unexcused failure to raise foreign-law defenses in a timely manner, whether because of a single-minded focus on an alternative line of defense or because it came to appreciate that that defense might not prevail, was unreasonable.

### B.  Choice of Law

"A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state."  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).  The forum here is New York.  Under New York law, "'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the

---

[4] Revealingly, although Global had initially contemplated offering at trial the testimony of handwriting and ink experts, when questioned by the Court at the June 27, 2014 conference, Global stated that it now intends to offer, at most, the testimony of an ink expert, whose testimony, it acknowledged, would be inconclusive as to central issues bearing on authenticity. Tr. 14, 16, 19, 62.

jurisdictions involved.'" *Id.* (quoting *In re Allstate Ins. Co., (Stolarz)*, 81 N.Y.2d 219, 223 (1993)).  Accordingly, the Court must determine whether there is an actual conflict between the laws of New York and the UAE as to the issue presented here.  If there is no conflict, "New York, as the forum state, would apply its law."  *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006).  If there is a conflict, then the Court must determine which law applies based on the "center of gravity" or "grouping of contacts" analysis.  *GlobalNet*, 449 F.3d at 383.

For the reasons that follow, New York law and UAE law are not in conflict as to the issues presented here.  And, even if, hypothetically, they were, New York law would control.  Thus, even if Global's argument based on UAE law were timely made, it would fail on the merits.

### 1.   UAE and New York Law Are Not In Conflict

It is undisputed that the Agreement, if authentic, is valid under New York law and therefore that a conflict of laws arises here if, and only if, the contract would be invalid under UAE law.  The Court must assesses whether the Agreement is valid under UAE law.

"'[T]he party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case.'"  *Bigio v. Coca-Cola Co.*, No. 97 Civ. 2858 (BSJ), 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010) *aff'd*, 675 F.3d 163 (2d Cir. 2012) (quoting *Baker v. Booz Allen Hamilton, Inc.*, 358 Fed. App'x 476, 481 (4th Cir. 2009)).

"Written or oral expert testimony accompanied by extracts from various kinds of foreign legal materials remains the basic mode of proving foreign law."  *Id.* (citing 9A C. Wright & A. Miller, Fed. Prac. & Proc. § 2444 (3d ed.)).  Al Maya has submitted a helpful expert declaration and accompanying exhibits, from Hassan Arab, who identifies himself as the Deputy Managing

Partner and Regional Head of Litigation at Al Tamimi & Company, the largest law firm in the region.  Dkt. 61 ("Arab Decl.") ¶ 2.  Global did not originally submit an expert declaration. Instead, until its motion for reconsideration, it relied on the research of its American counsel and his asserted understanding of UAE law.

Global argues that the Agreement is invalid because Al Maya's signatory, Kalwani, was not authorized to sign the contract.  The parties agree that, if Kalwani had the authority to sign the contract, it was on the basis of an agency agreement.  Global argues that UAE law requires such agency agreements to be written, not oral, and that a commercial agent must be a UAE national.  Global Br. 6.  In support of this thesis, Global cites Dubai Court of Cassation Case No. 142/2001, which states that "Articles 1, 2, 3, 4 & 22 of the Commercial Agency Law No. 18 of year 1981 provide that in order for the Agency to be valid and for a Lawsuit relating to it to be heard by the Court, the Agent must be a UAE National (Emirati) and he should be associated with the Principal by a written agency agreement duly attested and registered in the Special Register at the Ministry of Economy in the UAE."  Global Br. Ex. 5.  Global separately argues that the Agreement is invalid under UAE Federal Law No. 18 of 1981, Articles 10 and 11, and UAE Federal Law No. 2 of 2010, because it was not notarized, registered, or signed on both pages, and Al Maya did not make an appropriate application to the Committee of Commercial Agencies.   Global Br. 7–9.

Global does not, however, provide any further support for its legal claims, nor did it put these requirements in helpful context, so as, perhaps, to explain why the UAE might have chosen thus to impose these limitations on the ability of participants in a modern economy to contract. And Global's failure to present a UAE law expert in support of its American counsel's claims as to the ostensible requirements of UAE law necessarily casts doubt on counsel's constructions.

Helpfully, however, in his declaration, Arab, Al Maya's expert, offers the necessary context.  As Arab explains, not all UAE agency agreements are subject to the technical requirements on which Global seizes.  Instead, there are two kinds of commercial agency agreements in the UAE: (1) registered commercial agencies, which afford certain benefits but which come with heightened requirements, including those cited by Global; and (2) unregistered commercial agencies, which lack the benefits but also the technical requirements of registered agreements.  Arab Decl. ¶¶ 10–17.   A report by the law firm of Latham & Watkins, LLP, entitled "Doing Business in the United Arab Emirates," is in accord.  It notes the existence of registered and unregistered commercial agency agreements, stating that "[t]here is no formal procedure required for an unregistered commercial agency to be valid other than parties negotiating and agreeing [on] the terms of their arrangement."  *See* Dkt. 62 ("Shapiro Aff.") Ex. K at 5; *see also* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").

Al Maya argues, based on Arab's declaration, that the cases and statutes cited by Global pertain solely to registered commercial agencies.  By contrast, the Agreement, if authentic, reflects an unregistered commercial agency not subject to the formalities that Global recites. Arab's analysis is persuasive:

> 10.  Overseas manufacturers or traders who wish to import goods into the UAE will often enter into an agency agreement appointing a local trader, distributor or commercial agent to be their authorized distributor.  Agency agreements create a commercial agency relationship under UAE law.  These commercial agency relationships can either be registered or unregistered.
>
> 11.  Registered commercial agencies are subject to the UAE Commercial Agency Law (Federal Law No. 18 of 1981 and its amendments), which offers significant protections for the local registered agent . . . .  Among other requirements, registered commercial agents are required to be UAE nationals or companies

incorporated within the UAE and wholly owned by UAE nationals; registered agency agreements must also be properly notarized; and registered agency agreements must be registered with the Commercial Agencies Register maintained by the UAE Federal Ministry of Economy.

12.   In contrast, unregistered commercial agenc[y] relationships are governed by the UAE Commercial Code (Federal Law No. 18 of 1993 and its amendments), and the UAE Civil Code (Federal Law No. 5 of 1985 and its amendments). Unregistered commercial agencies, by their very nature, are not capable of registration . . . nor do they need to comply with [the] requirements set forth in the UAE Commercial Agency Law . . . relating to agency agreements which do qualify for registration.   Nonetheless, unregistered commercial agencies are considered valid and enforceable commercial contracts under UAE law, in which the parties will be bound by the terms and conditions agreed upon.  No procedure is required for an unregistered commercial agency agreement to be valid, other than the generally applicable requirements for commercial contracts under the UAE Commercial and Civil Codes. . . .

13.   The UAE Ministry of Economy has taken the position that it will not register agency agreements that relate to certain staples, including food and drink.  It is understood that the Ministry does not believe that it would be proper to extend the statutory exclusivity provided to registered commercial agents to such items. Because the Agreement concerns the distribution of food and drink, it is not able to be registered with the commercial agencies register, and has the legal status of an unregistered commercial agency under UAE law.

. . .

15.   Similarly, UAE Federal Law No. 2 of 2010 regarding dispute resolution through the Committee of Commercial Agencies relates expressly to disputes arising out of a "commercial agency registered with the [UAE Federal] Ministry of Economy."  . . .

16.  [Under Article 125 of the UAE Civil Code,] a commercial contract is defined broadly as "the coming together of an offer made by one of the contracting parties with the acceptance of the other, together with the agreement of them both in such a manner as to determine the effect thereof on the subject matter of the contract." The cornerstone of commercial contract formation under UAE law is mutual consent.

17.   . . .   Article 132 of the UAE Civil Code specifically contemplates that commercial contracts can be made "orally or in writing," or as a result of the conduct of the parties "demonstrating mutual consent."  . . .  In accordance with these principles, UAE law does not generally impose formal requirements (*e.g.*, signing of all pages of the contract, notarization, or registration with the

government) with respect to the writing or making of a written commercial contract.

Arab Decl. ¶¶ 10–13, 15–17 (citations omitted).

The Court credits Arab's lucid, comprehensive, and persuasive expert declaration, which is corroborated by Latham & Watkins's clear report, over Global's sparse, lay, and implausibly inflexible exposition of UAE law.[5]  Indeed, tellingly, the expert declaration that Global subsequently submitted along with its motion for reconsideration contradicts Global's initial arguments, although Global, regrettably, did not say so forthrightly in the brief accompanying that motion.  *See* Dkt. 64 Ex. 1 ("Mehawej Decl.") ¶ 4 ("It is clear that UAE Law does not require the power of attorney, issued by the principal to the agent, to be in writing."); *id.* ¶ 5 ("Agency agreements entered into by a principal and an agent to import merchandise into the United Arab Emirates can be registered with the Ministry of Economy in UAE and will then be subject of the Commercial Agencies Law (No. 18 of year 1981 and its amendments).  If it is not registered, it is governed by the Commercial Transactions Law (No. 18 of year 1993).  The Agreement of 1999 is not registered with the UAE Ministry of Economy and is therefore governed by Law No[.] 18 of year 1993.").

Accordingly, the Court holds that the contract, if authentic, would be valid under UAE law.  Because, as noted, the parties agree that the Agreement, if authentic, would be valid under New York law, there is no conflict.  Accordingly, "for practical reasons, that is, for ease of

---

[5] Global also appears to argue, albeit with considerably less than the desired clarity, that this suit is time-barred, because "Federal Law No[.] of 1993, § 228, provides that no suit arising from an agency agreement may be brought after three years from the termination of the agency," and the Agreement "was de facto terminated in 1999 since absolutely no dealings were conducted between [Al Maya] and Global."  Global Br. 6.  This argument fails on its own terms, because termination of the agreement between Al Maya and Global would not work a termination of Kalwani's agency agreement with the owner of Al Maya.

administrating the case," if Global had timely raised the issue, the Court would apply New York

law to the Agreement.  *Wall*, 471 F.3d at 422.

### 2.  If There Were a Conflict, New York Law Would Apply

Even if there were a conflict between UAE and New York law, New York law would still

apply.

New York courts determine which law applies based on the "center of gravity" or

"grouping of contacts" analysis.  *GlobalNet*, 449 F.3d at 383.  "Put differently, New York courts

apply 'the law of the place which has the most significant contacts with the matter in dispute.'"

*Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) (quoting *Auten v. Auten*,

308 N.Y. 155, 160 (1954)).  "[T]he New York Court of Appeals has identified five factors

relevant in determining which state has the 'most significant relationship' to a contract dispute:

(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of

performance, (4) the location of the subject matter of the contract, and (5) the domicile or place

of business of the contracting parties."  *Id.* at 151–52 (citing and quoting *Zurich Ins. Co. v.*

*Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309 (1994)).

The "traditionally determinative choice of law factor" is "the place of contracting."

*Zurich*, 84 N.Y.2d at 317.  Because a contract is formed upon acceptance, the "'place of

contracting'" is "'where the acceptor . . . communicates, or otherwise transmits its acceptance.'"

*Ingram Micro, Inc. v. Airoute Cargo Exp., Inc.*, 154 F. Supp. 2d 834, 840 (S.D.N.Y. 2001)

(quoting 2 Williston, Contracts § 6.34 (4th ed. 1990)); *accord H & H Acquisition Corp. v. Fin.*

*Intranet Holdings*, 669 F. Supp. 2d 351, 359 n.4 (S.D.N.Y. 2009); *TSR Silicon Resources, Inc. v.*

*Broadway Com Corp.*, No. 06 Civ. 9419 (NRB), 2007 WL 4457770, at *3 n. 3 (S.D.N.Y. Dec.

14, 2007).

Al Maya persuasively argues that, based on the record evidence and reasonable inferences drawn therefrom, the Agreement was counter-signed in New York by Kevin Egan, Global's signatory, such that the place of contracting is New York.  *See* Al Maya Br. 9–11.  In particular, Egan testified that he lives in New York State; that he has worked for Global, which is based in Manhattan, since 1988; and that he was not traveling in June 1999.  Shapiro Aff. Ex. E ("Egan Dep.") at 5, 6, 75.  The Jamaica Chamber of Commerce, whose stamp appears to certify that the Agreement was properly executed, is located in Jamaica, Queens; and Eleanor Makinen (née Cruz), whose signature-stamp appears on the Agreement on behalf of the Jamaica Chamber, was an employee of a contractor of the Jamaica Chamber, also based in Queens.  Egan Dep. 48–50; Shapiro Aff. Ex. G ("Richards Dep.") at 44; Shapiro Aff. Ex. H ("Makinen Dep.") at 11, 32, 61; Agreement at 2.  Accordingly, the evidence indicates that, if the Agreement is authentic, it was accepted in New York.  Global, for its part, does not cite any record evidence to the contrary.

The other factors are, as Al Maya points out, in equipoise.  Neither party has submitted evidence as to the place the Agreement was negotiated.  And the place of performance, location of the subject matter, and place of the business of the contracting parties are all equally divided between the two jurisdictions, as the Agreement concerns the export of goods from New York to the UAE.  Global asserts that other criteria are relevant, including "domicile of the aggrieved party; place of the delivery of the goods sold; place where the goods are to be located," but it cites no authority in support.  Global Br. 5.  In addition, Global asserts that certain facts established in discovery—including that the Agreement was prepared and executed in the UAE—weigh in its favor.  *See id.* 1–3.  But that list of facts is unsupported by any citation to

16

record evidence.  The Court therefore does not credit counsel's unsubstantiated claim to this effect.

In sum, based on the record evidence, there are no factors favoring the application of UAE law, and there is one significant factor, the place of acceptance, favoring the application of New York law.  Accordingly, were there a conflict between UAE and New York law, the Court would apply New York law.

## III.    The Motion for Reconsideration

The standard governing motions for reconsideration under S.D.N.Y. Local Civil Rule 6.3 "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  Such a motion is "neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced."  *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005); *see also Goonan v. Fed. Reserve Bank of N.Y.*, No. 12 Civ. 3859 (JPO), 2013 WL 1386933, at *2 (S.D.N.Y. Apr. 5, 2013) ("Simply put, courts do not tolerate such efforts to obtain a second bite at the apple.").  On a Local Rule 6.3 motion, "a party may not advance new facts, issues, or arguments, not previously presented to the Court."  *Polsby v. St. Martin's Press*, No. 97 Civ. 690 (MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (Mukasey, J.) (citation omitted).

Global's motion for reconsideration is entirely improper.  It consists of a combination of old and new arguments, along with new assertions of fact, all of which are barred on a motion for reconsideration.  It does not include the one thing a motion for reconsideration should include:

controlling decisions or data, which had previously been brought to the Court's attention, that the Court overlooked.  Global's motion for reconsideration is all the more audacious, in that, having been filed before the Court issued its opinion explaining its bottom-line order, Global could not, and did not even pretend to be, directing its motion to overlooked decisions or facts. Nevertheless, for the sake of completeness, the Court will address, on the merits, Global's motion for reconsideration.

### A.      Kalwani's Authority to Sign the Agreement

In 1995, Mohammed Essa Mohammed Al Samt, the owner of Al Maya, issued a written power of attorney to three individuals, including Deepak Pagarani, authorizing them to take any actions in favor of Al Maya that they saw fit, including by delegation of that authority.  Arab Decl. Ex. 7 ¶ 14; *see also* Arab Decl. ¶ 21.  According to Arab, "[t]his is a commonplace structure in the UAE for a company such as Al Maya."  Arab Decl. ¶ 21.  Pagarani then orally delegated to Kalwani the authority to sign contracts for all companies in the Al Maya group, including the petitioner here.  Shapiro Aff. Ex. C ("Kalwani Dep.") at 19; Global Reconsideration Br. 3.

Global originally argued that an oral power of attorney was *per se* invalid under UAE law.  Global Br. 6 ("Under UAE law, oral powers of attorney are disregarded."); *see supra* Section II.B.1 (rejecting that argument).  In its motion for reconsideration, Global appears to retreat from that argument, and instead now raises two new arguments as to why Kalwani purportedly lacked authority to sign the Agreement under UAE law.

First, Global argues that UAE law would recognize Pagarani's oral power of attorney to Kalwani only if there had been proof of a course of dealings between Al Maya and Global.[6] Global Reconsideration Br. 3.  This argument appears to rely on the following statement by Global's expert:

> It is clear that UAE Law does not require the power of attorney, issued by the principal to the agent, to be in writing; however, in order to evidence whether an agency existed, the extent of such agency, and whether the agent is allowed to do what he has done under the agency, the claimant must provide strict proof. Article 112 of the Civil Transactions Law does not consider [an] oral statement to constitute an evidentiary instrument.

Mahawej Decl. ¶ 4.  But this statement, if credited,[7] only establishes the evidentiary status of oral statements in UAE courts.[8]  This Court, of course, is not bound by UAE rules of evidence.

Second, Global argues that UAE and New York law allow an agent to delegate their authority only when the original power of attorney so provides; it claims that "the 1995 power of attorney does not expressly provide Mr. Pagarani with the authority to delegate the agency by Al Samt to a third party, either orally or in writing."  Global Reconsideration Br. 4.  This point does not assist Global, however, because the 1995 power of attorney expressly allows Pagarani "[t]o delegate all or part of the Authority vested in [him] hereby to one or more persons."  Arab Decl.

---

[6] It is not clear to the Court why, if a course of dealing were required, the relevant course of dealing would be that between the contracting parties, Al Maya and Global, rather than between the agent and sub-agent, Pagarani and Kalwani.  *Cf. supra* n.5.

[7] The Court is disinclined to give weight to the Mahawej Declaration.  It is not nearly as clear or comprehensive as the Arab Declaration, and it outlandishly claims that this Court lacks jurisdiction to hear this case because of UAE jurisdictional law.  *Id.* ¶ 5 ("I believe that [Al Maya] has wrongfully filed its case before New York Court and that such Court lacks jurisdiction, according to UAE Law, to look into the current case.").

[8] Nor is it clear what, precisely, the Mahawej Declaration means by the statement, "Article 112 of the Civil Transactions Law does not consider [an] oral statement to constitute an evidentiary instrument."  *Id.* ¶ 5.  The Mahawej Declaration does not explain what, precisely, an "evidentiary instrument" is, and whether it is coextensive with admissible evidence; nor does the Mahawej Declaration attach Article 112 of the Civil Transactions Law so that this Court could understand the context behind this sparse explanation of UAE law.

Ex. 7 ¶ 14.  Irresponsibly, in making this argument, Global neither mentions this fact nor cites any contrary evidence.

**B.     Standing**

In its reply in support of its motion to dismiss, filed March 12, 2014, Global argued that Al Maya was not a "proper party in interest" because a different Al Maya corporate entity had been Global's distributor in the United Arab Emirates since 2002.  Global MtD Reply Br. 6.  In its March 19, 2014 decision, this Court held that this argument, *i.e.*, that Al Maya does not have a meritorious claim to have been harmed by Global's alleged termination of an Al Maya entity as its exclusive distributor, was "a merits issue irrelevant to the instant motion to compel arbitration" and that "[a]ny claim along these lines is to be raised, if at all, before the eventual factfinder."  Dkt. 36 at 4.

At the June 27, 2014 conference, Global slightly recast that argument.  It claimed that Al Maya lacked standing to bring this action, because, in fact, Global had business dealings with a different entity, Al Maya International Zone, not Al Maya Trading Establishment, the petitioner here.  Tr. 26–27.  At the conference, the Court held, consistent with its March 19, 2014 decision, that this issue bore on liability and/or damages and thus was one for the ultimate factfinder to decide.  Tr. 54–55.

Global now argues, once again, that it had no dealings with this Al Maya entity, and so this Al Maya entity cannot have standing to sue Global.  Global Br. 10; Global Reconsideration Br. 2–3.  Global's apparent support for this factual claim is Pagarani's deposition testimony that "AMTE [Al Maya Trading Establishment, the petitioner here] only holds paperwork.  They don't do any business, *per se*.  The business is all carried out by Al Maya International, FZC."  *See*

Global Reconsideration Br. 3.[9]  But Al Maya has adequately pled injury to itself.  *See, e.g.*, Pet. ¶ 23 (alleging that Al Maya was party to the exclusive distribution agreement); *id.* ¶¶ 36–45 (alleging breach of same).  And for the purpose of resolving the petition to compel arbitration, it is irrelevant whether this Al Maya entity actually did business with Global, *i.e.*, whether Al Maya or another Al Maya entity to which it had delegated responsibility, received and distributed Global's goods; or whether the entity that received and distributed Global's goods was legally unconnected to Al Maya.  That factual question, which goes to the merits, is for another day, after the petition to compel arbitration has been resolved.  The question on this petition is solely whether, as Al Maya claims, its written Agreement with Global that contains the arbitration clause at issue was authentic, or whether, as Global claims, the Agreement is a forgery.  That question will be decided by the jury in the upcoming trial.[10]

### C.   Leave to Appeal

Global also requests, in a single sentence, "leave to appeal."  Global Reconsideration Br. 5 (explaining only that "the issues lie at the core of the court's jurisdiction over the issues and would be dispositive of the dispute").  Global appears to be requesting permission to take an interlocutory appeal under 28 U.S.C. § 1292(b), under which a district court may certify an order for interlocutory appeal when it is "of the opinion that such order [1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that

---

[9] Global did not submit this—or, for that matter, any other—deposition testimony along with its motion for reconsideration.  For the purposes of this motion, however, the Court will assume that Global has accurately, and in proper context, quoted Pagarani's deposition testimony.

[10] To the extent that the argument Global makes is that no damages have resulted from its alleged breach, that is a merits issue to be decided by the arbitrator, or, if the jury finds the Agreement to have been a forgery, by a court or jury.  *See Policemen's Annuity & Ben. Fund v. Bank of Am., NA*, No. 12 Civ. 2865 (KBF), 2013 WL 5328181, at *5 (S.D.N.Y. Sept. 23, 2013), *adhered to by* 2014 WL 2086426 (S.D.N.Y. May 5, 2014) ("Any liability and damages determinations . . . is separate from standing.").

an immediate appeal from the order may materially advance the ultimate termination of the

litigation." 28 U.S.C. § 1292(b).   Interlocutory appeals under § 1292(b) are "strongly

disfavor[ed]" and are to be "'strictly limited'" to "'exceptional circumstances.'" *Murray v. UBS*

*Sec., LLC*, No. 12 Civ. 5914 (KPF), 2014 WL 1316472, at *3 (S.D.N.Y. Apr. 1, 2014) (quoting

*In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996)).   "The movant bears the burden of demonstrating

that all three of the substantive criteria are met." *Id.* at *2.  "'Even where the three legislative

criteria of Section 1292(b) appear to be met, district courts retain unfettered discretion to deny

certification if other factors counsel against it.'" *Id.* at *3 (quoting *In re Facebook, Inc., IPO*

*Sec. and Derivative Litig.*, No. 12 Civ. 2389 (RWS), 2014 WL 988549, at *2 (S.D.N.Y. Mar. 13,

2014)).

Global's request is, decisively, denied.   As this opinion has made clear, there is no

"substantial ground for difference of opinion" on either the UAE law or standing issues.  And

Global, audaciously, sought leave to appeal before this Opinion issued.  Global therefore had no

basis on which to claim that the Court's decision presented an "exceptional circumstance" that

justifies interlocutory appeal.  In fact, no such circumstances are presented by the Court's fact-

bound ruling.  There is no basis on which to authorize an interlocutory appeal, and doing so here

would unjustifiably delay resolution of Al Maya's petition to compel arbitration.  *See ISC*

*Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 114 (2d Cir. 2012) ("[P]etitions to compel

arbitration . . . should receive a 'summary and speedy disposition.'") (quoting *Moses H. Cone*

*Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 27 (1983)).

### D.       Further Document Examination

Finally, Global asks permission for its expert, Valery Aginsky, to take the original copy

of the Agreement to Chicago to examine it under a "very high optical resolution microscope."

Global Reconsideration Br. 6.  That request was made, and denied, at the June 27, 2014 conference.  Tr. 52.  Global has given the Court no reason to reconsider that decision.

However, Global's alternative request—that Al Maya be precluded "from questioning Mr. Aginsky at trial about his not having examined the document with a high resolution optical microscope"—appears reasonable.  *See* Global Reconsideration Br. 6.  Al Maya shall submit a letter, by July 17, 2014, stating whether it takes issue with this request, and, if so, on what basis.

## CONCLUSION

For the foregoing reasons, Global's motion for summary judgment based on UAE law is denied.  The Court holds that Global's notice of its intent to raise the UAE law issue was untimely; the Agreement is governed by New York law; and under New York law, no issue has been raised as to the Agreement's validity, apart from Global's claim that it is a forgery.  Separately, the Court holds, Al Maya has standing to petition to compel arbitration.

Trial will proceed, as scheduled, on September 2, 2014, on the sole issue of whether the Agreement is authentic.  Pre-trial submissions are due according to the schedule reflected at docket number 58.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 15, 2014
New York, New York